**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

CYNTHIA RICHARDS-DONALD,

      Plaintiff,

   v.

TIAA BOARD OF OVERSEERS;
TEACHERS INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA; TIAA-CREF
INDIVIDUAL & INSTITUTIONAL SERVICES,
LLC; and JARROD FOWLER, in his individual
and official capacities,

      Defendants.

------------------------------------------------------------X

Index No. 13 CV 7405 (DAB)

**THIRD AMENDED**
**COMPLAINT**

JURY TRIAL DEMANDED

   Plaintiff Cynthia Richards-Donald ("Plaintiff"), by and through undersigned counsel,

Wigdor LLP, as and for the Third Amended Complaint in this action against Defendant TIAA

Board of Overseers, Defendant Teachers Insurance and Annuity Association of America,

Defendant TIAA-CREF Individual & Institutional Services, LLC (collectively, "TIAA," the

"Company," or "Corporate Defendants"), and Defendant Jarrod Fowler ("Mr. Fowler")

(together, "Defendants") hereby states and alleges as follows:

## NATURE OF THE CLAIMS

   1.  TIAA, an iconic American financial institution, through its patterns, practices

and/or policies, unlawfully discriminates against African-American employees on the basis of

their race. At TIAA, African-American employees are subjected to a pervasive institutional

culture of racism, where they are compensated at a lower rate than their white colleagues, denied

opportunities for career advancement, and forced to endure a workplace where racist and

inappropriate comments are tolerated. The senior leadership of the Company is aware of and

permits this conduct, and retaliates against employees who file complaints about the general lack of diversity at TIAA and the clearly discriminatory atmosphere by terminating them and otherwise adversely and negatively changing the terms and conditions of their employment.

2.     Cynthia Richards-Donald, after an approximately 20-year career with TIAA in which she was frequently praised as a superior performer and was responsible for bringing tens of millions of dollars of investments into the Company, was forced to leave her employment with the Company on September 13, 2013, purportedly in connection with a reorganization and/or reduction-in-force ("RIF").  Although TIAA claims that Ms. Richards-Donald was given a choice of relocation to New Orleans from Charlotte in lieu of a separation from the Company, she was never presented with this option by her supervisor, Mr. Fowler, who instead persistently and aggressively pushed her to sign a separation agreement and release during the summer of 2013.  Ms. Richards-Donald's effective termination by Mr. Fowler came mere weeks after she raised concerns with members of upper management regarding the discrimination she experienced at the Company, as well as its overall lack of minority representation.  In addition to this complaint, Ms. Richards-Donald previously sent a memorandum to Human Resources ("HR") complaining about the lack of diversity at TIAA, as well as expressing her concern about an incident in which Miguel Shefferson, an African-American Wealth Management Advisor, was told by other members of the department that his casual workday attire made him look like a "thug," a racially charged epithet.  Moreover, her memorandum questioned why an African-American Director had been forced out of her position and replaced by two white men.  Despite TIAA's claim that it investigated these complaints, no remedial action was taken.

3.     Sadly, Ms. Richards-Donald's termination was merely the culmination of the discriminatory conduct to which she was subjected at TIAA, including being compensated at a

far lower rate than her less-qualified, white colleagues.  During her career at the Company, Ms.

Richards-Donald's work was consistently praised, and she was told specifically by a manger that

she should be compensated at the top end of the Wealth Management Advisor scale.  Despite

this, she was paid at the lowest end of the scale for Wealth Management Advisors.  Even when

TIAA announced in 2010 that all Wealth Management Advisors making under $100,000 (a

group that included Ms. Richards-Donald) would receive raises, Ms. Richards-Donald had to

complain to Mr. Fowler before she received a raise.  Even with the small pay increase she

received, she still was paid substantially less than her white colleagues with similar tenure and

levels of professional achievement.

4.      Furthermore, Ms. Richards-Donald was continuously denied opportunities for

career advancement at TIAA.  She frequently applied for more advanced positions within TIAA,

but was consistently passed over in favor of white candidates with undoubtedly lesser

qualifications.  By way of example, TIAA promoted Doug Marlow, a white male who formerly

worked under Ms. Richards-Donald and had only recently obtained his college degree from the

University of Phoenix, and Molly McCormick, a white employee who did not have a college

degree, to the position of Director, yet failed to promote Ms. Richards-Donald despite her more

extensive experience, educational background, and professional certifications.  Furthermore,

sales leads located in Ms. Richards-Donald's exclusive territory were often given to her white

sales colleagues, contrary to policy and practice, seriously damaging her sales figures and

potential incentive compensation.  Mr. Fowler was the primary offender in this practice and

would frequently give leads in Louisiana, Ms. Richards-Donald's exclusive sales territory, to

white Wealth Management Advisors.  This was despite the fact that Ms. Richards-Donald had an

expansive network of contacts throughout Louisiana and had been successful in generating

revenue from that area.  Additionally, upon information and belief, unassigned, desirable sales leads were given nearly exclusively to white employees, inflating their sales totals and leading to greater compensation and promotion opportunities.

5.      This is an action for declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices and retaliation committed against Plaintiff, including Defendants' discriminatory treatment, harassment and unlawful retaliation against Plaintiff, due to her race, color, and complaints of discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant TIAA Board of Overseers, Defendant Teachers Insurance and Annuity Association of America, and Defendant TIAA-CREF Individual & Institutional Services, LLC's headquarters are located within the Southern District of New York and a substantial part of the events or omissions giving rise to this action, including unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

8.      Plaintiff has complied with all statutory prerequisites to her Title VII claims, having filed a charge of discrimination with the Equal Employment Opportunity Commission

("EEOC") and having received notice of her right to sue from the EEOC. This action was filed within 90 days of receipt of her EEOC right to sue letter.

     9.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

### Cynthia Richards-Donald

     10.     Plaintiff Cynthia Richards-Donald is a female, African-American former employee of TIAA. Ms. Richards-Donald was effectively terminated from her position as a Wealth Management Advisor in the Company's Charlotte, North Carolina office in July 2013. Her last day of employment with the Company was on or around September 13, 2013. She is a citizen of the United States, and at all relevant times met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

### Corporate Defendants

     11.     Defendant TIAA Board of Overseers is a private entity with its headquarters located at 730 3rd Ave, New York, NY 10017, and a local office located at 8500 Andrew Carnegie Blvd, Charlotte, NC 28262. At all relevant times, Defendant TIAA Board of Overseers met the definition of "employer" and/or a "covered employer" under all relevant statutes.

     12.     Defendant Teachers Insurance and Annuity Association of America is a privately held, not-for-profit corporation, wholly owned by TIAA Board of Overseers, with its headquarters located at 730 3rd Ave, New York, NY 10017, and a local office located at 8500 Andrew Carnegie Blvd, Charlotte, NC 28262. At all relevant times, Defendant Teachers Insurance and Annuity Association of America met the definition of "employer" and/or a "covered employer" under all relevant statutes.

     13.     Defendant TIAA-CREF Individual & Institutional Services, LLC is a privately held, not-for-profit, wholly owned subsidiary of Teachers Insurance and Annuity Association of

America, with its headquarters located at 730 3rd Ave, New York, NY 10017, and a local office located at 8500 Andrew Carnegie Blvd, Charlotte, NC 28262.  At all relevant times, Defendant TIAA-CREF Individual & Institutional Services, LLC met the definition of "employer" and/or a "covered employer" under all relevant statutes.

14.     At all relevant times, Ms. Richards-Donald was employed by Defendants.

15.     Defendants TIAA Board of Overseers, Teachers Insurance and Annuity Association of America, and TIAA-CREF Individual & Institutional Services, LLC share common ownership, common directors and/or officers, common financial control, and are operated as an integrated enterprise.

16.     Upon information and belief, Defendant TIAA Board of Overseers approved yearly budgets for all other Corporate Defendants.

17.     Upon information and belief, Defendant TIAA Board of Overseers approved incentive compensation pools for all employees of Corporate Defendants, including Wealth Management Advisors.  By way of example, during Ms. Richards-Donald's tenure at TIAA, the TIAA Board of Overseers approved the bonus pool for Wealth Management Advisors on a yearly basis, which directly affected the level of Ms. Richards-Donald's incentive compensation.

18.     Skip Spriggs, Executive Vice President and Chief Human Resources Officer, has authority and supervisory power over Human Resources functions for all Corporate Defendants.

19.     Brandon Becker, Executive Vice President and Chief Legal Officer, has authority and supervisory power over legal functions for all Corporate Defendants.

20.     Upon information and belief, President and Chief Executive Officer of the TIAA-CREF brand Roger Ferguson has decision making authority, including the ability to create and

institute corporate policy, for Defendants Teachers Insurance and Annuity Association of America and TIAA-CREF Individual & Institutional Services, LLC.

21.    Moreover, there is a clear chain of decision making authority from Mr. Ferguson to Defendants Teachers Insurance and Annuity Association of America and TIAA-CREF Individual & Institutional Services.  By way of example, Ms. Richards-Donald's immediate supervisor was Jarrod Fowler, who reported directly to Christopher Weyrauch, Senior Managing Director of Wealth Management.  In turn, Mr. Weyruach was supervised by Kathie Andrade, Executive Vice President of Wealth Management, who reported directly to Mr. Ferguson.

22.    Mr. Ferguson simultaneously holds a position on the TIAA Board of Overseers. See https://www.tiaa-cref.org/public/about-us/leadership-governance/boards-committees.

23.    Ms. Richards-Donald was held out to be a member of TIAA-CREF Individual & Institutional Services, LLC, with this being reflected on her email communications and on the business cards she was issued.

24.    At all relevant times, however, Ms. Richards-Donald's paychecks were issued by Defendant Teachers Insurance and Annuity Association of America.

**Jarrod Fowler**

25.    Defendant Jarrod Fowler is Branch Office Manager for the West Region of TIAA's Wealth Management Group.  In this capacity, Mr. Fowler directly supervised Ms. Richards-Donald from around December, 2009 until the end of her employment with the Company on September 13, 2013, and directly had authority over the terms and conditions of Ms. Richards-Donald's employment.  In this position, Mr. Fowler directly and personally participated in the unlawful discriminatory and retaliatory policies and practices to which Ms. Richards-Donald was subjected.

26.    Although Mr. Fowler worked in Texas, he was tasked with overseeing Defendants' operations in several different sales territories, including, but not limited to, those located in Washington, Colorado, California, Arizona, Arkansas, and Kansas.

27.    As part of his responsibilities, Mr. Fowler would frequently travel to these various territories.

28.    Upon information and belief, Mr. Fowler performed his job responsibilities in accordance with the guidelines and policies promulgated by Mr. Ferguson and Kathie Andrade, both of whom are located in Defendants' New York City headquarters.

## FACTUAL ALLEGATIONS

**Background**

29.    Ms. Richards-Donald was first hired by TIAA in 1993 as a consultant in the Company's New York office.

30.    In 1998, Ms. Richards-Donald became a consultant in Counseling Services and remained in the same position at TIAA when her office was moved from New York to Charlotte in 2000.

31.    In 2004, Ms. Richards-Donald became a Wealth Management Advisor in the Wealth Management Group, a position that she held until the end of her employment in September, 2013.

32.    Throughout her employment, she received universal and consistently high praise from her supervisors, peers, and clients, and was instrumental in securing millions of dollars in investments for TIAA.

33.    By way of example only, earlier this year, Michael Lyons, Director of Individual Advisory Services, informed Ms. Richards-Donald that 52% of clients she met with invested

with TIAA for the first time or increased their investment, by far the highest mark on her team and one of the highest nationally.

### Discrimination Against Ms. Richards-Donald

34.    There is a pervasive, institutional culture of racism at TIAA that blocks African-American employees from rising to management/director positions and also results in their being paid less than their white colleagues.

35.    Many African-American employees were forced to leave TIAA, rather than continue to be subjected to this racial "glass ceiling."

36.    By 2007, Ms. Richards-Donald was one of only three African-American Wealth Management Advisors ("WMAs") out of approximately 15 to 20 WMAs in the Charlotte office. By 2008, only two minority WMAs remained, and at the time of her termination she was the only minority WMA in the entire Charlotte office.

37.    Ms. Richards-Donald continued to earn praise for her work, including being told by one of her supervisors that her base salary should be at the top end of the WMA scale (around $150,000/year).

38.    Instead, TIAA paid Ms. Richards-Donald a salary of around $85,000 in 2008, at the low end of the compensation scale for a WMA at the time, and far less than her white colleagues with similar or lesser experience, qualifications, and production.

39.    In and around December of 2009, Jarrod Fowler, Branch Manager for the West Region of TIAA's Wealth Management Group, became Ms. Richard-Donald's direct supervisor. In this position, Mr. Fowler directly controlled the terms and conditions of Ms. Richard-Donald's employment.

40.     In his position as her direct supervisor, Mr. Fowler discriminated against Ms. Richards-Donald on the basis of her race.

41.     In January of 2010, it was announced at a business conference that the salary freeze was over and that any WMA not making $100,000 would receive a raise.  Ms. Richards-Donald did not receive a raise until she sent an email to Mr. Fowler to complain.  Her salary was then increased by only $2,000 to around $95,000/year.  This was still significantly less than the increases received by her white peers with similar tenure and levels of professional achievement.

42.     During her time in Wealth Management, Ms. Richards-Donald tried to move to a Manager position from her position as a WMA, but was rebuffed repeatedly in favor of less-qualified white employees.

43.     In 2010, Ms. Richards-Donald applied for a position as CRS Manager, interviewed for that position, and was ultimately rejected in favor of Nate Russell, a white employee.

44.     In February of 2011, Mr. Russell was terminated by TIAA for racial discrimination after leaving an extremely offensive and derogatory voicemail for an African-American employee.

45.     TIAA subsequently illustrated how its culture and management continues to treat minority employees unfavorably by giving the vacant position to Doug Marlow, a white employee with substantially less qualifications than Ms. Richards-Donald.

46.     Mr. Marlow had formerly worked under Ms. Richards-Donald before he was promoted to a WMA position, and he had already been rejected for three previous manager positions.  Additionally, he had been previously investigated by TIAA for improper sales practices.

47.     Furthermore, Ms. Richards-Donald has been a Certified Financial Planner ("CFP") since 2006.  Although Mr. Marlow also has this certification, he had only recently obtained an online college degree from the University of Phoenix at the time of his interview.

48.     In November, 2012, Ms. Richards-Donald applied for another Director position within the Field Consulting Group, this time with a recommendation from Russell Noles, Senior Managing Director & Chief Strategy Officer at TIAA.

49.     After several attempts to phone the HR recruiter, Ms. Richards-Donald sent an email following up on the position.  She did not receive a response from HR for three or four weeks.  The HR representative who contacted her said that there was substantial competition for the position and that she would pass her information along to the hiring manager.  Ms. Richards-Donald was never interviewed.

50.     Earlier in 2013, Ms. Richards-Donald applied for a Centralized Director position within Wealth Management.

51.     Although Ms. Richards-Donald learned of and applied for the position through a job posting, many white, male employees in the Charlotte, Denver, and Lewisville offices knew of the opening before it was posted.

52.     When Ms. Richards-Donald was called for a phone interview for the Centralized Director Position, Human Resources intimated that she was unlikely to get the job, and that she should not be disappointed or surprised if she did not get it.

53.     The position ultimately went to Michael Kutzleb, a white employee who had only been with TIAA for five years and had far less experience than Ms. Richards-Donald.

54.     TIAA again recently showed its apparent emphasis on race over qualifications in its hiring decisions, as highlighted by the hiring of Molly McCormick as a Director within

Wealth Management this year.  Ms. McCormick, who is white, not only has no advanced financial industry certifications, but does not hold a college degree.  Ms. McCormick has also had business funneled to her by her superiors, and was given credit for unassigned sales.

55.    Ms. Richards-Donald was never provided with any high-value business by her managers, and has not been credited with business that she did not actively cultivate.

**Culture and Practice of Racism at TIAA**

56.    Ms. Richards-Donald was highly successful in developing business and client relationships, despite being forced to contend with a discriminatory culture that consistently undermined her ability to do her job and gave inappropriate advantages to her white co-workers.

57.    In August 2010, Ms. Richards-Donald secured a lead on a potential $10 million investment by Louisiana Public Broadcasting ("LPB") through one of her clients.

58.    Ms. Richards-Donald was so highly regarded by this client that he helped her prepare for the meeting with LPB.  Her thorough preparations with the client included reviewing mock responses to potential questions from LPB.

59.    Ms. Richards-Donald then flew to Louisiana and met Ero Johnson, the white Director of Endowments, Peter McHugh, a Senior Portfolio Manager, and John O'Shea, an attorney with TIAA.

60.    In the Board meeting, despite the fact that she had done virtually all of the leg work and had the full confidence of her client, Mr. Johnson actively undercut Ms. Richards-Donald by preventing her from talking to the potential clients, literally growling at her at the conference table when the Board members and CEO were gathering in the room.

61.    Mr. Johnson went on to ignore all the specific recommendations on how to present to LPB that Ms. Richards-Donald had passed along from her client, and as a result TIAA lost the potential investment.

62.    Mr. Johnson habitually undermines the authority of minority employees, as he also seized control of a potential investment from Nestor Montoya, a Hispanic-American employee working out of one of TIAA's Arizona offices.

63.    In addition, Mr. Fowler directly discriminated against Ms. Richards-Donald on the basis of her race by routinely and improperly giving leads located in Ms. Richards-Donald's exclusive sales territory to her white colleagues, directly damaging her sales potential.

64.    Louisiana was designated as Ms. Richards-Donald's sales territory, but Mr. Fowler frequently would give leads within Louisiana to Josh Rauschenbach, a white WMA.

65.    By way of example only, Mr. Fowler assigned several leads involving medical professionals at Louisiana State University Health Science Center in Shreveport to Mr. Rauschenbach, justifying this by saying that Mr. Rauschenbach had family in Northern Louisiana and he did not believe that Ms. Richards-Donald was developing sales in that region.

66.    However, in December, 2011 and early 2012, Ms. Richards-Donald learned that Mr. Fowler had given several other leads within her territory, including Tulane University President Scott Cowen, to Mr. Rauschenbach, despite the fact that she frequently visited New Orleans, had an expansive network of contacts in that area, and developed large amounts of business there.

67.    This practice of directing Ms. Richards-Donald's sales leads to her white colleagues inflated the sales figures of less-qualified individuals and directly led to missed career opportunities and loss of pay for Ms. Richards-Donald.  For example, Ms. McCormick was

frequently credited with such sales, and her inflated sales figures resulted in her being appointed director and earning approximately $100,000 more than Ms. Richards-Donald while she was an advisor.

68.     White WMAs were frequently given leads from management, giving them a tremendous advantage over minority employees, including Ms. Richards-Donald, in bringing in investments.

69.     Additionally, investments that came in that were not assigned directly to any WMA would by default be credited to the accounts of white WMAs, giving them a further tremendous advantage in terms of their production, leading to higher and disparate compensation and promotion opportunities.

70.     Ms. Richards-Donald was not given high-value leads by her managers throughout her tenure at TIAA.

71.     White WMAs also engaged in unethical practices related to selling universal life insurance policies, often soliciting clients to buy insurance when they did not need additional coverage.  Furthermore, when white WMAs sold universal life insurance policies, their sales figures were credited with hundreds of thousands of dollars in sales credit (despite the fact that such revenue was not realized by the Company), inflating their sales figures.  In reality, each policy sold only conferred a small benefit upon TIAA.  Michael Lyons, Wealth Management Director, supported and encouraged this policy regarding insurance sales because his variable compensation was based on the sales figures of the WMAs he supervised.

72.     In contrast, Ms. Richards-Donald's sales figures, which reflected actual sales and revenue invested, reflected a far greater benefit to TIAA.

73.     Beyond having their sales potential negatively affected, minority employees at TIAA were forced to deal with a climate in which racial remarks and unprofessional behavior were not only tolerated, but the norm.

74.     By way of example only, one Client Relationship Consultant ("CRC") lamented to a client on the phone that the CRC's son would never play professional basketball because he was white.

75.     Doug Marlow, who TIAA promoted over Ms. Richards-Donald, made the blatantly racist comment to her that "growing up, the only black people [he] interacted with are the ones who cleaned [his] house."

76.     On another occasion, Mr. Marlow stated that after vacationing in Old San Juan, Puerto Rico, he understood why "all the Puerto Ricans moved to Brooklyn."

77.     On yet another occasion, during Thanksgiving of 2012, Mr. Marlow posted a comment on Facebook that he felt like the original European settlers of North America, because the "white man had Indians over for dinner," in reference to his hosting of his Indian (South-Asian, rather than Native-American) neighbors for Thanksgiving dinner.  This racist comment was accessible to the general public via Facebook, including various TIAA employees among his "friends."

## Retaliation Due To Ms. Richards-Donald's Protected Complaints

78.     In September, 2009, Ms. Richards-Donald sent an eight-page memorandum to Gina Maltese in Human Resources, expressing her concern about an incident in which Miguel Shefferson, an African-American WMA, was told by other members of the department that his casual workday attire made him look like a "thug," a racially charged epithet.

79.     Additionally, the memo questioned the reasons for Valerie Day, an African-American Director of Wealth Management, being forced out of her position and replaced by two white men, despite her excellent track record.

80.     Rather than responding to Ms. Richards-Donald's concerns, TIAA failed to take any remedial action whatsoever.

81.     In December, 2011, at the urging of Russell Noles, Senior Managing Director & Chief Strategy Officer at TIAA, Ms. Richards-Donald filed a report with the TIAA employee hotline, again voicing her concerns about the lack of diversity at TIAA, barriers to advancement for minority employees, and the overall environment of racism.

82.     Although Human Resources claimed to investigate her complaints, TIAA's pattern of disparate racial treatment continued.  This pattern is evidenced by, among other things, the fact that in November, 2012, Ms. Richards-Donald was not contacted to follow up on a position for which she was eminently qualified.

83.     In April, 2013, Ms. Richards-Donald was specifically informed that the TIAA policy relating to minority hiring only required minority candidates to be interviewed, and not hired.  TIAA's managers therefore commonly interviewed minority candidates, despite having no intention of hiring them.  This unlawful and discriminatory policy and practice was confirmed to her by a member of the Human Resources department.

84.     Ms. Richards-Donald immediately reached out to Russell Noles, who asked her if he could forward her complaint to people within TIAA who he felt could help change this racially discriminatory and pernicious practice.

85.     In April 2013, Ms. Richards-Donald was named TIAA's National Chair for African-American and Caribbean Resource Groups.

86.     Through this position, she was able to meet with Stephanie Bell-Rose, a Senior Managing Director, with whom she shared her concerns about the lack of diversity at TIAA and the discrimination she had suffered.

87.     Ms. Bell-Rose told Ms. Richards-Donald that she would convey these concerns to Roger Ferguson, the CEO of TIAA, Skip Spriggs, Executive Vice President of Human Resources, and Jerome Miller, Chief Diversity and Inclusion Officer.

88.     Ms. Bell-Rose also urged Ms. Richards-Donald to meet with Jerome Miller.

89.     Ms. Richards-Donald met with Mr. Miller in early May 2013, and raised her concerns about the fact that, given her tenure and level of expertise, she should have been paid in the highest tier of WMAs, but was instead compensated at a lower level than her white colleagues. Ms. Richards-Donald also specifically told him that her qualifications compared favorably with those of Molly McCormick, and that she should have been compensated at Ms. McCormick's level.

90.     On June 3, 2013, less than a month after Ms. Richards-Donald's complaints to upper management, TIAA announced a RIF. Ms. Richards-Donald was informed that her position in Charlotte was being eliminated.

91.     TIAA claims Ms. Richards-Donald had the choice of signing a separation agreement or being relocated to New Orleans. However, Mr. Fowler only presented her with a separation agreement and release of claims, and repeatedly demanded that she sign it in an attempt to end her employment with and force her out of TIAA while also ensuring that she waive her right to pursue legal remedies against him and the Company for their unlawful conduct.

92.     TIAA transparently used its RIF as an opportunity to force Ms. Richards-Donald out of the Company for consistently daring to challenge the institutional culture of racism and discrimination that pervades TIAA, which Ms. Richards-Donald also certainly would have continued to do in the future until the Company took action to investigate and remedy these serious issues.

93.     Indeed, the Company later revealed that its supposed offer of relocation to Ms. Richards-Donald was a sham when it withdrew any offer of another position to her as it became clear that she would not accept continued employment on TIAA's discriminatory terms. Furthermore, many TIAA employees who were supposed to be relocated did not, in fact, change offices for months after their supposed transfer, and at the time of the filing of this Third Amended Complaint, the Company was still attempting to staff the new Louisiana office to which Ms. Richards-Donald would supposedly have been relocated.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Discrimination and Harassment in Violation of Section 1981)**

94.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

95.     Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981 by denying her the same terms and conditions of employment available to white employees, including, but not limited to, subjecting her to disparate working conditions and denying her terms and conditions of employment equal to those of white employees.

96.     Defendants have discriminated against Plaintiff on the basis of her race in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that has included, among other things, severe and pervasive discrimination.

97.     As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits, for which she is entitled to an award of damages.

98.     As a direct and proximate result of the Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of damages.

99.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

100.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

101.     Defendants have retaliated against Plaintiff by failing to promote her, paying her at a lower rate, failing to appropriately credit her business development efforts, terminating her employment, and failing to consider her for alternate job positions in response to Plaintiff's protected complaints of discrimination and questioning of the Company's minority hiring policy.

102.     These complaints came mere weeks before she was terminated, purportedly pursuant to a RIF.

103.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

104.   As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

105.   Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Discrimination and Harassment in Violation of Title VII)

106.   Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

107.   By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her race in violation of Title VII by denying her the same terms and conditions of employment available to white employees, including, but not limited to, subjecting her to disparate working conditions and denying her terms and conditions of employment equal to those of white employees.

108.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

109.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and

emotional distress, including but not limited to humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

110.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**

111.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

112.    Defendants have retaliated against Plaintiff by failing to promote her, paying her at a lower rate, failing to appropriately credit her business development efforts, terminating her employment, and failing to consider her for alternate job positions in response to Plaintiff's protected complaints of discrimination and questioning of the Company's minority hiring policy.

113.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

114.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

115.    Defendants' unlawful and retaliatory actions constitute malicious willful and wanton violations of Title VII for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct (including reinstatement), and to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's life and career;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate for all monetary and/or economic damages, including, but not limited to, future income, wages, compensation, seniority, and other benefits of employment;

E.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

F.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational

harm and harm to professional reputation, in an amount to be determined at trial, plus

prejudgment interest;

       G.      An award of punitive damages, and any applicable penalties and/or liquidated

damages in an amount to be determined at trial;

       H.      An award of costs that Plaintiff has incurred in this action, including, but not

limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the

fullest extent permitted by law; and

       I.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: August 13, 2014
       New York, New York

       Respectfully submitted,

       **WIGDOR LLP**


       By: _____
           Douglas H. Wigdor
           Lawrence M. Pearson
           Matthew R. Pisciotta

       85 Fifth Avenue
       New York, NY 10003
       Telephone: (212) 257-6800
       Facsimile: (212) 257-6845
       dwigdor@wigdorlaw.com
       lpearson@wigdorlaw.com
       mpisciotta@wigdorlaw.com

       *Attorneys for Plaintiff*